## 45906. JARRELLS v. THE STATE.
(375 SE2d 842)

HUNT, Justice.

Jonathen Jarrells was convicted by a Walker County jury of murder, armed robbery and aggravated assault. He was sentenced to death.[1]

Gertie Elrod and her sister Lorraine Elrod lived together in Chattoogaville across the road from the defendant's brother and his family. On August 24, 1987, Jarrells arrived from West Virginia to visit his brother. Lorraine Elrod talked to Jarrells when he came over with two of his brother's children to borrow some water. On the afternoon of August 27, Jarrells came over by himself and asked to use the phone. Lorraine Elrod testified that she let him in and returned to her chores while he used the telephone. When she looked up, he was armed with a pair of scissors, and her sister was backed against a chair with a stunned look on her face. After telling the sisters he was

---

[1] The crime was committed in Chattooga County on August 24, 1987. The defendant was arrested the next day. He was indicted on January 19, 1988. The defendant's motion for change of venue was granted and, by agreement of the parties, Walker County was chosen as the site of the trial. The trial began on February 22, 1988, and ended March 5, 1988. Jarrells was sentenced to death for murder on March 5, 1988. A motion for new trial was filed March 22, 1988 and amended April 19, 1988. The motion was heard April 20, 1988, and denied by an order dated May 5, 1988 and filed May 10, 1988. A notice of appeal was filed, and the case was docketed in this court June 21, 1988. Jarrells was granted an extension of time to file his enumeration of errors, and oral arguments were heard September 14, 1988.

going to rob them, Jarrells stabbed them. He forced them into a bedroom, tied their hands and feet with electrical cords, and beat them with a clothing iron. He searched the house for items of value, returning from time to time to check on his captives, and then he left. Lorraine Elrod does not remember how long he stayed. She and her sister were discovered the next morning by their nephew. He testified:

> I saw Gertie and Lorraine lying on the bed, Lorraine was at the head of it, they were lying crossways, and Gertie was about midways, and there was a lots of blood, just blood all over them, blood all over the bed, more blood than I have ever seen anywhere before . . . Gertie [appeared to be] dead, and Lorraine, she was moving a little . . . and she was trying to talk to us, but her voice was too faint and I couldn't hear, I couldn't understand what she was trying to say.

The doctor who treated Lorraine Elrod testified that she appeared to have been struck on the head at least a dozen times. She had broken teeth, a broken nose, multiple broken facial bones and lacerations all over her face and head.

Lorraine Elrod survived, but has permanent injuries, including loss of sight in one eye, loss of hearing in one ear, and missing and broken teeth. Gertie Elrod died, from "blunt force trauma to the head."

Jarrells left Chattoogaville about the time the victims were discovered. Based on information furnished by Lorraine Elrod and by the defendant's sister-in-law, Jarrells was located and arrested that afternoon in Hazard, Kentucky. Numerous items belonging to the Elrod sisters were recovered from his vehicle.

The evidence, viewed in the light most favorable to the state, amply supports the conviction. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

1. At a pretrial conference in December of 1987, the trial court stated for the record that one of the defendant's two attorneys was a former assistant district attorney; that he expected to campaign for the office of District Attorney in 1988; and that he wanted the trial of the case completed before summer so that it would not interfere with his campaign. The court stated that it expected a trial in the spring, and asked the defendant if he wished "to proceed with" his present attorneys.

Jarrells contends the trial court erred when it refused to grant his attorney's request for a "few seconds" to consult with his client before he answered the question. However, Jarrells had ample opportunity to consult with his attorney afterward, and was not foreclosed by his answer from raising the issue later. There was no possibility of

prejudice, and no reversible error. Cf. *Perry v. Leeke*, ___ U. S. ___ (109 SC 594, ___ LE2d ___) (No. 87-6325, decided January 10, 1989) (44 CrL 3053).

2. The trial court did not err by refusing to order state's witnesses to submit to pretrial interviews with defense attorneys. *Baxter v. State*, 254 Ga. 538 (4) (331 SE2d 561) (1985).

3. The trial court furnished Jarrells with the services of an investigator, a psychologist, a medical examiner, and a fingerprint expert. Jarrells complains of the court's denial of funds for the services of a metallurgist.

On February 12, 1988, Jarrell's investigator discovered in a pond personal items, including a steel knife, belonging to the victims.[2] On the last day of voir dire, Jarrells moved for the appointment of a defense metallurgist. The motion was supported by an affidavit from the metallurgist, stating that corrosion on the items indicated they had been in the water "up to a month." Jarrells contended that, if this was true, he could not have discarded these items, since he had been in jail for far longer than a month when the items were recovered.

The trial court denied the motion based on evidence presented at the hearing which showed that the "pond" filled and drained according to the weather, and that the pond was dry in August, when the crime occurred, and thereafter to at least late December. Despite the denial of funds, the metallurgist nevertheless testified for the defense at trial that in his opinion the knife (which he could most accurately evaluate because of its metallurgical composition and its shape) had been immersed "for probably two, three weeks' time," and "no more than a month[ ]." There was testimony at trial that the pond was dry from August until mid-January.

Assuming that Jarrells made a sufficient showing of need for the assistance of a metallurgical expert, *Crawford v. State*, 257 Ga. 681, 686 (362 SE2d 201) (1987), since the metallurgist did testify, Jarrells was not denied the services of this expert, and no harm has been shown.

4. An expert employed by the state crime laboratory was appointed to assist the defense. Absent a showing that this expert divulged any information to the state, any issue as to whether such information should be kept confidential to the defendant is moot.

5. Jarrells complains of the state's examination of arresting Officer Smoot of Kentucky.

(a) Jarrells raised in his opening statement an issue about some beer cans in the back of his pickup that allegedly were exculpatory

---

[2] Evidence at trial indicated these items were found in water that was a foot and a half to two feet deep.

(because the fingerprints of the real culprits were on them) but were not saved by the police. Later, Jarrells cross-examined Officer Smoot about the contents of a garbage bag and about some beer cans found in the cab of his pickup.

The pickup was searched while Jarrells was being interrogated. At some point during the interrogation, Jarrells was brought outside to his pickup. On redirect examination of Officer Smoot, the state asked if the defendant had said anything about the beer cans and asked whether they would have been saved if the defendant had suggested they were significant. The only contemporaneous objections by the defendant to this line of questioning were two objections to leading questions, both of which were sustained. Thus we need not address the merits of his present contention that this questioning amounted to a comment on his right to remain silent after being given *Miranda* warnings. See, e.g., *Hill v. State*, 250 Ga. 277 (4) (295 SE2d 518) (1982). However, we note that Jarrells waived his right to silence along with his other rights under *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966), and talked to the police. He did not invoke his right to silence when he was taken outside to his vehicle; he merely said nothing about the beer cans.

(b) Jarrells also claimed in his opening statement that the evidence would show he agreed to be extradited to Georgia, stating, "sure, I'll go back, I want to clear this up because I didn't do it."

During its redirect examination of Officer Smoot, the state asked whether Jarrells had agreed or refused to be extradited when the subject was first mentioned. Smoot answered, "Refused."

Jarrells objected to this answer on the ground that it was an in-custody statement not furnished before trial on request as required by OCGA § 17-7-210. He now contends the court erred by refusing to grant a mistrial.

Assuming, without deciding, that OCGA § 17-7-210 applies to the kind of statement at issue here, see, e.g., *Reeves v. State*, 169 Ga. App. 665 (2) (314 SE2d 682) (1984), there was no error. Although the trial court initially overruled the objection, the court later sustained it and instructed the jury to disregard the answer. Since the remedy provided by OCGA § 17-7-210 is the exclusion of the statement, the statute was complied with, and the defendant failed to renew his motion for a mistrial after the curative instructions were given. See *Brown v. State*, 187 Ga. App. 347 (1) (370 SE2d 203) (1988).

6. After the jury reached its verdict at the guilt phase of the trial, it was returned to the jury room for supper while the court held a conference under the Unified Appeal Procedure in preparation for the sentencing phase of the trial. A few minutes later, the court learned that the two alternates were in the jury room with the jury. The alternates were returned to the courtroom and questioned by the court.

The alternate jurors stated they had told the jury they agreed with its verdict at the guilt phase of the trial, but did not discuss the matter of sentence. The alternates were then taken to a separate jury room.

The court asked if the defendant wished to raise an issue about the matter. His attorneys initially answered in the negative, but then, "out of an abundance of caution," moved for a mistrial "based on the communications with the jurors regardless of what they might have been." The court questioned each of the 12 jurors, who confirmed there were no conversations about punishment during the short time the alternates were with the jury. The court did not err by denying the motion for mistrial. *Lonchar v. State*, 258 Ga. 447 (5) (369 SE2d 749) (1988); *Johnson v. State*, 235 Ga. 486 (6) (220 SE2d 448) (1975).

7. Jarrells' constitutional attacks on the Unified Appeal Procedure and Georgia death penalty statutes are without merit. *Frazier v. State*, 257 Ga. 690 (3) (362 SE2d 351) (1987).

8. In the circumstances of this case, the conviction for aggravated assault does not merge into that for armed robbery. *Smith v. State*, 258 Ga. 181 (4) (366 SE2d 763) (1988); *Coaxum v. State*, 146 Ga. App. 370 (246 SE2d 403) (1978). The trial court did not err by refusing to deliver Jarrells' requested jury instruction that the jury could find him guilty of armed robbery or aggravated assault, but not both. *Smith v. State*, supra (2).

9. There was no abuse of discretion in the admission of photographs of the murder victim. *Hicks v. State*, 256 Ga. 715 (13) (352 SE2d 762) (1987).

10. There was no prosecutorial misconduct relative to the committal hearing. Cf. *Pruitt v. State*, 258 Ga. 583 (2) (373 SE2d 192) (1988).

11. The trial court agreed to charge the crime of robbery as a lesser included offense of armed robbery, but denied Jarrells' request to charge theft by taking as a lesser included offense of armed robbery. This denial was not erroneous. *Frazier v. State*, supra, 257 Ga. at 699-700 (17).

12. Absent a request, the trial court did not err by failing to define torture in its sentencing-phase charge. *West v. State*, 252 Ga. 156, 160 (313 SE2d 67) (1984).

13. The identification of the defendant by Lorraine Elrod was not impermissibly tainted by an unnecessarily suggestive photographic display, and the trial court did not err by allowing her testimony. See, e.g., *Rivers v. State*, 250 Ga. 303 (4) (298 SE2d 1) (1982).

14. Since Lorraine Elrod testified at trial and was subject to cross-examination, her previous statements identifying the defendant to investigators were admissible over a hearsay objection. *Cuzzort v. State*, 254 Ga. 745 (334 SE2d 661) (1985).

15. Attorney fees are not properly in issue on this appeal. *Moon*

*v. State*, 258 Ga. 748 (6) (___ SE2d ___) (1988). Absent any contention that he was denied adequate investigative assistance, neither is the amount approved by the court for the investigator.[3]

16. The defendant raised no issue of mental retardation. OCGA § 17-7-131 (a) (3). Compare *Spraggins v. State*, 258 Ga. 32 (1) (364 SE2d 861) (1988). Nor does the record show that he is mentally retarded. His death sentence is not, by reason of low intelligence, excessive or disproportionate, or otherwise improper under the law. Compare OCGA § 17-7-131 (j).

17. The jury found as statutory aggravating circumstances:

1. The offense of murder was committed while the defendant was engaged in the commission of another capital felony . . . armed robbery.
2. The defendant committed the offense of murder for himself or another, for the purpose of receiving money or any other thing of monetary value.
3. The offense of murder was outrageously or wantonly vile, horrible, or inhuman, in that it involved:
   (a) torture
   (b) depravity of mind

See OCGA § 17-10-30 (b) (2), (b) (4) and (b) (7). The evidence supports these findings. OCGA § 17-10-35 (c) (2).

18. Jarrells' death sentence was not imposed under the influence of passion, prejudice or other arbitrary factor. OCGA § 17-10-35 (c) (1).

19. The similar cases listed in the Appendix support the imposition of a death sentence in this case. OCGA § 17-10-35 (c) (3).

*Judgment affirmed. All the Justices concur.*

### APPENDIX.

*Cohen v. State*, 257 Ga. 544 (361 SE2d 373) (1987); *Jefferson v. State*, 256 Ga. 821 (353 SE2d 468) (1987); *Beck v. State*, 255 Ga. 483 (340 SE2d 9) (1986); *Ingram v. State*, 253 Ga. 622 (323 SE2d 801) (1984); *Spivey v. State*, 253 Ga. 187 (319 SE2d 420) (1984); *Roberts v. State*, 252 Ga. 227 (314 SE2d 83) (1984); *Mincey v. State*, 251 Ga. 255 (304 SE2d 882) (1983); *Jones v. State*, 249 Ga. 605 (293 SE2d 708) (1982); *Berryhill v. State*, 249 Ga. 442 (291 SE2d 685) (1982); *Solo-*

---

[3] The defendant asked for and received $2,000 for the services of an investigator. He now contends this was inadequate to pay an investigative bill of some $6,000. The claim then, is not that he was denied necessary investigative assistance, but that the investigator was underpaid for the assistance that was rendered. This simply is not an issue addressable on this appeal.

*mon v. State*, 247 Ga. 27 (277 SE2d 1) (1981); *Dick v. State*, 246 Ga. 697 (273 SE2d 124) (1980); *Jones v. State*, 243 Ga. 820 (256 SE2d 907) (1979); *Amadeo v. State*, 243 Ga. 627 (255 SE2d 718) (1979); *Corn v. State*, 240 Ga. 130 (240 SE2d 694) (1977); *Young v. State*, 237 Ga. 852 (230 SE2d 287) (1976); *Pulliam v. State*, 236 Ga. 460 (224 SE2d 8) (1976); *Dobbs v. State*, 236 Ga. 427 (224 SE2d 3) (1976); *Goodwin v. State*, 236 Ga. 339 (223 SE2d 703) (1976); *Mitchell v. State*, 234 Ga. 160 (214 SE2d 900) (1975); *Moore v. State*, 233 Ga. 861 (213 SE2d 829) (1975).

DECIDED FEBRUARY 8, 1989.

*Roland L. Enloe, Jr., Samuel C. Finster, Sr., Frank B. Perry*, for appellant.

*David L. Lomenick, Jr., District Attorney, Michael J. Bowers, Attorney General, Paula K. Smith, Assistant Attorney General*, for appellee.